Filed 3/2/16  Marriage of Left CA2/2

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| In re the Marriage of ANDREA and ANDREW LEFT<br><br>ANDREW EDWARD LEFT,<br><br>          Appellant,<br><br>    v.<br><br>ANDREA NICOLE LEFT,<br><br>          Appellant. | B248856<br><br>(Los Angeles County<br>Super. Ct. No. BD436243) |

APPEAL from an order of the Superior Court of Los Angeles County.  Mark A. Juhas, Judge.  Affirmed in part and reversed in part.

Law Offices of Ariel Leichter-Maroko and Ariel Leichter-Maroko; Gary J. Cohen, for Appellant Andrew Edward Left.

Jarrette & Walmsley, Robert R. Walmsley and Marlea F. Jarrette for Appellant Andrea Nicole Left.

Andrew Edward Left (Andrew) appeals from a final judgment dated March 19, 2013, captioned as "Judgment on Reserved Issues" (property judgment).[1] Andrew challenges the trial court's decision to award half of the $9.2 million in post-separation earnings found in the Sentry Global investment account to Andrea Nicole Left (Andrea).[2] Andrew argues that the trial court's action had the effect of transmuting $9.2 million of Andrew's separate property into community property without his consent. Andrew also challenges the trial court's decision to charge him interest through entry of judgment on $1,271,795 in pre-judgment distributions made to Andrea. Andrew argues that Andrea was not entitled to interest after she received the funds. Andrew further argues that two real properties on Wendover Drive in Beverly Hills which were acquired during the marriage were improperly awarded to Andrea as her separate property, and that if they are indeed separate property, Andrew should have been reimbursed $95,000 he contributed to improvement of one of the properties.

Andrea cross-appeals from the property judgment. Andrea argues that the trial court erred in deviating from the statutory guideline for child support, and that the permanent child support order should have started as of June 2011. Andrea also contests the trial court's division of Andrew's post-separation trading earnings generated from community property. She argues that the parties agreed in 2007 that Andrew would be granted the first $1.5 million per year in trading gains as income and that any excess gains were community property. Andrea contends that this agreement should be held to continue beyond calendar year 2007. Finally, Andrea argues that Andrew should have been sanctioned for failing to disclose investment opportunities and that the trial court

---

[1]    A status-only judgment which dissolved the parties' marriage was entered on June 30, 2008. The judgment expressly reserved jurisdiction over all remaining issues. A custody judgment was entered on April 18, 2011, which also expressly reserved remaining issues. The parties have previously been before this court on Andrew's appeal from the trial court's order denying his application to terminate spousal support. (*In re Marriage of Left* (2012) 208 Cal.App.4th 1137 (*Left*).)

[2]    To avoid confusion and follow the convention in family law appeals, the parties will be referred to by their first names.

committed reversible error by declining to award appropriate sanctions and attorney fees against Andrew.

We reverse the trial court's denial of Andrew's claim for reimbursement of a $95,000 payment made to improve the 9790 Wendover property in April 2006. The judgment is otherwise affirmed in full.

## FACTUAL BACKGROUND

Andrew and Andrea married in June 2001 and separated four and one-half years later, in February 2006. Andrew is a successful securities trader, who generates income solely by trading securities for his own accounts. Andrea was a practicing attorney before the marriage and early in the marriage, but she stopped working when she became pregnant in 2001. There are two minor children of the parties' marriage: J., who is now 11 years old, and L., who is now nine years old. Both children have special needs. J. has been diagnosed with autism and suffers from developmental delays. L. was born prematurely. However, the trial court found that the residual effects of her premature birth are limited to some speech therapy and a monitoring of her vision.

On November 18, 2005, Andrea filed a petition for dissolution of marriage. Andrew filed his response on June 3, 2008. The status-only judgment issued on June 30, 2008, dissolved the marriage.

On February 7, 2007, the parties entered into a stipulation re: temporary support and custody, pursuant to which Andrew was required to pay monthly spousal support of $32,547, and monthly child support of $14,590. The order assumed that Andrew would generate trading income of $1.5 million for calendar year 2007, from which he would pay support. It also stated that Andrew's 2007 trading income exceeding $1.5 million would be community property.

On May 2, 2009, Andrea participated in a commitment ceremony with Dr. Todd Katzman (Todd). Andrea and Todd signed a ketubah (a Jewish marriage contract). However, Andrea and Todd did not obtain a marriage license. (*Left, supra*, 208 Cal.App.4th at p. 1141.) The trial court noted that at the time of its tentative decision in May 2012, Andrea was no longer with Todd.

3

Andrew has remarried.  He and his new wife, Stephanie Left (Stephanie), have a child.

At the date of his separation from Andrea, Andrew provided the sole support of the family as a stock trader.  On the date of separation the parties had $2,193,609 in community liquid assets.  After the parties' separation, Andrew invested the money, using it to support himself and his family as well as pay support to Andrea and the children.  Andrew did not pay himself a salary but withdrew money as needed for himself as well as for Andrea and the children.  Between the date of his separation from Andrea and the beginning of trial, Andrew generated net earnings in excess of $20 million.

## PROCEDURAL HISTORY

Andrea commenced the action by filing her petition for divorce on November 18, 2005.  The status-only judgment dissolving the marriage was entered on June 30, 2008, and the custody judgment was entered on April 18, 2011.  Trial on the property and support issues began on May 23, 2011, five and one-half years after the parties separated.  The 18-day trial took place over the course of 10 months, ending on March 22, 2012.

**May 1, 2012 tentative decision**

On May 1, 2012, the trial court issued a tentative decision on the submitted matters.  As to child support, the trial court found that Andrew was eligible for a deviation from the guideline support amount under Family Code section 4057, subdivision (b)(3).[3]  However, the trial court declined to deviate from the guideline support amount because Andrew failed to provide meaningful evidence of the children's expenses.  The trial court found that it could not deviate from the guideline support unless Andrew provided the court "with a number that represents the reasonable needs of the

---

[3]    Family Code section 4055 sets forth a formula for determining the uniform guideline for child support orders.  This amount is presumed to be the correct amount of child support to be ordered.  (Fam. Code, § 4057.)  However, the presumption is rebuttable.  Under Family Code section 4057, subdivision (b)(3), the following factor may be considered to deviate from the guideline support amount:  "The parent being ordered to pay child support has an extraordinarily high income and the amount determined under the formula would exceed the needs of the children."

4

children." The trial court further found that the evidence "clearly" demonstrated that Andrea's form FL-150 "significantly overstate[d] the actual amount that [Andrea] spends on the children every month." Thus, starting May 1, 2012, Andrew was ordered to pay Andrea $129,367 per month.

The trial court terminated the spousal support which Andrew paid for a period longer than the marriage itself. The trial court found that the children's needs did not interfere with Andrea's ability to find gainful employment and that Andrea had made no real effort to become employed since the date of separation.

The parties agreed that on the date of separation, the community had $2,193,609 in community liquid assets, which Andrew invested after separation. The funds were used to support Andrew and his family as well as pay support to Andrea and the children. Since the date of separation, Andrew continued to "maintain, trade and grow the primary community asset, cash." The trial court found that though Andrew's trading activities did not constitute a business, the investments fell within the language of *In re Marriage of Imperato* (1975) 45 Cal.App.3d 432, 436 (*Imperato*), which states, "If the earnings of a spouse in some manner increase the value of a community asset [post separation], the court must then determine what portion of the asset is community property and what portion is separate property." The court further noted that while any just and equitable apportionment method may be adopted, typically, courts will apply either *Pereira v. Pereira* (1909) 156 Cal.1 (*Pereira*) or *Van Camp v. Van Camp* (1921) 53 Cal.App.17 (*Van Camp*) formulas in reverse. (*Imperato, supra*, at pp. 438-439.)

"[T]he *Pereira* approach would allocate a fair return of the increase to the community property and the excess would be husband's separate property. The *Van Camp* formula would determine the reasonable value of the husband's services (less the draws or salary taken) and allocate this additional sum, if any, to husband as his separate property and the balance of the increase to community property." (*Imperato, supra*, 45 Cal.App.3d at p. 439.)

The trial court determined that a *Van Camp* analysis would be inappropriate here because there was no evidence of Andrew's reasonable compensation. Thus, the court

5

applied *Pereira*. The court awarded Andrea one-half of the community property as set forth in the 2007 order plus a 10 percent return on the amount of community property as of January 1, 2008, through the entry of judgment.

As to the Sentry Global account, the trial court explained:

> "When the parties separated, [Andrew] was a defendant in *Rana v. Left*, a civil defamation action. A default judgment in the sum of $2.5 million was entered against [Andrew] (which was not disclosed to [Andrea]). Subsequent to entry of that judgment, [Andrew] purchased a judgment against Mr. Rana, which resulted in Mr. Rana owing the community approximately $280,000 (which also was not disclosed to [Andrea]). The Sentry Global account was opened in May, 2006 when the $280,000 was deposited into it. When the initial deposit was made, Sentry Global took $30,000 out of the account for 'fees.' The parties do not challenge the fact that this is a community property amount nor do they challenge the $30,000 in 'start up' fees. Beginning in May 2006, [Andrew] began actively trading these funds."

Andrew closed the account in 2008 because he was not getting proper documentation on the account, which was located in Costa Rica. Before the account was closed, Andrew was able to withdraw $5,920,000. However, some money remained in the account when it was closed. This money was lost and the trial court found the loss was properly chargeable to Andrew. The trial court further found:

> "During the pendency of the existence of the Sentry Global account, [Andrew] had four opportunities to disclose the existence of the account and he failed to do so: 1) on his August 1, 2006 Preliminary Declaration of Disclosure; 2) on the February 7, 2007 Stipulation and Order; 3) via response to [Andrea's] Form Interrogatories; and 4) via response to [Andrea's] Request for Production of Documents. On each of these occasions, [Andrew] intentionally concealed the existence of the account."

The court found that Andrew's testimony that he forgot about the account, that he did not know whether it was real, or that he did not have statements from the account as reasons not to disclose were not credible. On May 12, 2011, Andrew first disclosed the existence of the Global Sentry account through the testimony of his expert, David

6

Frankel. The trial court found that there was a breach of fiduciary duty in Andrew's failure to disclose the Sentry Global account.

Due to Andrew's failure to disclose, the trial court found that he was in violation of Family Code section 2100, subdivision (c).[4] The court noted that Family Code section 1101, subdivisions (g) and (h), provide remedies for such a breach of fiduciary duty. Such remedies include "an award to the other spouse of 50 percent, or an amount equal to 50 percent, of any asset undisclosed or transferred in breach of the fiduciary duty plus attorney's fees and court costs. The value of the asset shall be determined to be its highest value at the date of the breach of the fiduciary duty, the date of the sale or disposition of the asset, or the date of the award by the court." (Fam. Code, § 1101, subd. (g).) Pursuant to section 1101, subdivision (g), the court stated it must award one-half of the highest balance in the Sentry Global account to the petitioner at one of three dates: date of breach of the fiduciary duty, date of disposition of the asset, or date of trial. The only reliable evidence before the court was the amount Andrew was able to withdraw from the account on the date it was closed: $5,920,000. The court added the loss chargeable to Andrew for a total of $6,515,289. In light of Andrew's breach of fiduciary duty, the court awarded Andrea one-half of that value, or $3,257.644.50. The court reserved the issue of a further sanction award pursuant to Family Code section 2107.

During the marriage the parties purchased two homes: 9790 Wendover and 9653 Wendover in Beverly Hills. The trial court acknowledged that pursuant to Family Code section 760, the homes are presumed to be community property. However, the trial court

---

**4** Family Code section 2100, subdivision (c) provides: "[A] full and accurate disclosure of all assets and liabilities in which one or both parties have or may have an interest must be made in the early stages of a proceeding for dissolution of marriage or legal separation of the parties, regardless of the characterization as community or separate, together with a disclosure of all income and expenses of the parties. Moreover, each party has a continuing duty to immediately, fully, and accurately update and augment that disclosure to the extent there have been any material changes so that at the time the parties enter into an agreement for the resolution of any of these issues, or at the time of trial on these issues, each party will have a full and complete knowledge of the relevant underlying facts."

7

awarded these homes to Andrea as separate property because both houses were placed in Andrea's name and Andrew signed deeds as to both homes signifying that the homes were intended to be Andrea's separate property.

The court found that Andrew made the following payments to Andrea which constituted a return of community property: "May, 2010 $400,000; May 2011 $793,743; June, 2011 $78,052." The court found that Andrew was to receive credit for these payments.

The court reserved the issue of attorney fee sanctions and any other professional fee requests.

Following the May 1, 2012 tentative decision, each party requested a statement of decision and responded to the other party's request.

**August 13, 2012 ruling**

On August 13, 2012, the trial court issued a ruling adopting the May 1, 2012 tentative decision as its proposed statement of decision with modifications and set the matter for hearing. The ruling sought guidance on the division of the Sentry Global account, stating:

> "At the time of the hearing, the court needs guidance on the following: [Andrea] is entitled to [one-half] of the Sentry Global account as of the date of separation. She is also entitled to [one-half] the increase of the value of the community property post separation pursuant to the *Pereira* formula as discussed in the tentative decision. After the Sentry Global account is divided, the remaining amount is respondent's separate property. She would also be entitled to 10% on the amounts that were removed from the account for the respondent's residence and the Palm Springs house, until the account was closed. Here is the question: Why is [Andrea] entitled to [one-half] of the balance at the date the account was closed, when she has already received her community property and the increase on it, as part of the other property division?"

The trial court also recalculated guideline support based on *In re Marriage of Knowles* (2009) 178 Cal.App.4th 35, which suggested to the court that the court could only consider one-half of Andrew's income pursuant to Family Code section 4057.5. The trial court re-ran the DissoMaster, attributing one-half of Stephanie Left's income to

8

Andrew, and one-half of his income to Stephanie. The trial court reiterated its finding that Andrea should receive 10 percent simple interest on the community property. However, the court specified that Andrew would "be given credit and interest will cease accruing against those payments he made to [Andrea] during the course of the litigation, as of the time the payment was made."

Each party objected to the proposed statement of decision. Further hearings were held on October 5, 2012, and November 7, 2012.

**November 30, 2012 ruling**

On November 30, 2012, the trial court issued its final ruling and its finalization of the statement of decision. The court noted that all prior rulings from the May 2012 and August 2012 decisions would stand except as modified by this or any other subsequent ruling. The court specified:

> "On May 1, 2012 the court issued a proposed statement of decision. Following various objections, the court issued an amended statement of decision on August 13, 2012. The court's tentative decision as stated in May stands as modified in the August revision. The court makes further revisions as below. As noted above, these three rulings are to be read in concert with one another. To the extent that a later ruling modifies an earlier one, the ruling latest in time stands."

*Child support*

The court revisited its prior ruling on *In re Marriage of Knowles, supra*, 178 Cal.App. 35, finding that the case does not control in this matter. However, the court found that a deviation from guideline child support was appropriate in this case because Andrew is an extraordinarily high income earner. The court was required to make a determination of the children's reasonable needs in order to deviate from the guideline. The court specifically held that there was sufficient information in the trial transcript as well as Andrea's form FL-150s for the court to determine the children's reasonable needs. The court cited *In re Marriage of Ostler & Smith* (1990) 223 Cal.App.3d 33 (*Ostler*) as authority for its ability to determine a child's reasonable needs when the

matters are nontechnical in nature and come within the court's common knowledge. The court made the following credibility determinations:

> "It is clear to the court, both from a review of the FL-150s and [Andrea's] testimony, that [Andrea's] expense numbers are inflated and as noted below in the attorney fees section may be double counting some of the costs. The evidence does not support that these two young children reasonably spend virtually $45,000 per year on clothing. It is difficult for the court to find credible that the petitioner spends in excess of $50,000 per year in restaurants on these children, while spending an additional $55,000 in groceries on them at home. Further, while the court acknowledges the difficulty of maintaining a household with two children, the petitioner is not gainfully employed outside of the home; the child care figure of $8,000 per month or $275 per day appears to be excessive; this amount rises to the level of a full time nanny."

The court noted: "It is apparent to the court that [Andrea] is stretching the needs of the children and herself far beyond the marital lifestyle and far beyond the apparent lifestyle in [Andrew's] home in an effort to build up her expenses."

Based on its assessment of the children's reasonable needs, the court set a child support amount of $37,500 per month payable from Andrew to Andrea, commencing January 1, 2013, or entry of judgment. Andrew was also ordered to pay 100 percent of the children's private school tuition, school fees and any school mandated services or tutoring of the children, as well as 100 percent of any uninsured medical care for the children.

### Sentry Global

The court found that Andrew had removed $1,050,000 for the purchase of a Palm Springs home and $1,700,000 for the down payment on another house from the Sentry Global account. The court found that this amount had to be added back into the balance, which was to be divided between the parties.

Andrew objected to the finalized statement of decision. Among other things, Andrew objected to the court's order requiring him to disgorge half of his profits in Sentry Global, which he argued should be considered his separate property. Andrew

pointed out that the court had correctly indicated that it had no jurisdiction to divide Andrew's separate property as a sanction.

On January 3, 2013, the court ruled on Andrew's objections stating, "The ruling here does not divide or sanction [Andrew's] separate property, it divided the community property. This account started as a totally community property asset. As a result, the court is not sanctioning [Andrew's] separate property."

**Final judgment and appeals**

The property judgment was entered on March 19, 2013. In April 2013, the court issued orders correcting the equalization payment.

Andrew and Andrea each filed a notice of appeal on May 20, 2013.

## DISCUSSION

### I. Applicable standards of review

A trial court's determination of the character of property as community or separate is normally reviewed under the substantial evidence standard. (*Somps v. Somps* (1967) 250 Cal.App.2d 328, 336.) Under this standard, where substantial evidence supports the trial court's findings, it cannot be disturbed on appeal. (*Ibid.*) "Our function has been fully performed when we find in the record substantial evidence which supports the essential [factual] findings of the trial court. [Citations.]" (*Sanchez v. Sanchez* (1961) 55 Cal.2d 118, 126.)

However, where the relevant facts are not in dispute and the issues center on selection of a rule or the interpretation of a statute, this court exercises independent review. (*In re Marriage of Norviel* (2002) 102 Cal.App.4th 1152, 1157 (*Norviel*).)

"Where mixed questions of fact and law require 'a critical consideration, in a factual context, of legal principles and their underlying values, the question is predominantly legal and its determination is reviewed independently. [Citation.]' [Citations.]" (*Norviel, supra*, 102 Cal.App.4th at p. 1157.)

Generally, rulings dividing community property are reviewed under the abuse of discretion standard. (*In re Marriage of Dellaria & Blickman-Dellaria* (2009) 172 Cal.App.4th 196, 201.) A family court's sanction award is also reviewed under the abuse

11

of discretion standard. (*In re Marriage of Feldman* (2007) 153 Cal.App.4th 1470, 1478; *In re Marriage of Drake* (1997) 53 Cal.App.4th 1139, 1168.) "To the extent that we are called upon to interpret the statutes relied on by the trial court to impose sanctions, we apply a de novo standard of review. [Citation.]" (*Feldman, supra*, at p. 1479.) "We review any findings of fact that formed the basis for the award of sanctions under a substantial evidence standard of review. [Citation.]" (*Ibid.*) Under this standard, all conflicts in evidence must be resolved in favor of the prevailing party, and all reasonable inferences indulged to uphold the finding if possible. (*Ibid.*)

## II. Andrew's direct appeal

### A. *Sentry Global*

We first address Andrew's arguments regarding the Sentry Global account. As set forth above, Andrew opened this account in Costa Rica with community property funds of $280,000. Andrea was not aware of the legal proceedings leading up to Andrew's receipt of the money. Nor was she aware of the existence of the account. The Sentry Global account was opened in May 2006, and at that time Andrew began actively trading the funds. When the account was closed in 2008, Andrew was able to remove $5,920,000 from the account. A sum of money was lost, the exact amount of which is unknown. The court found that the evidence showed an amount ranging from $103,000 to $595,289. The trial court found that despite four opportunities to disclose the existence of this account, Andrew failed to do so, and that he intentionally concealed the existence of the account. As a sanction for this breach of fiduciary duty, the court determined that it must, under Family Code section 1101, subdivision (g), award one-half of the balance of the Sentry Global account to Andrea on the date that the account was closed. The trial court considered the $5,920,000 which was withdrawn on the closing date, plus the $595,289 loss which the court found was chargeable to Andrew. This totaled $6,515,289. The trial court awarded Andrea half of this amount, $3,257,644.50.

## 1. The nature of the asset

### a. *Andrew's arguments*

Andrew concedes that the Sentry Global account was opened with community funds. However, he agues that post-separation earnings accumulated through his effort are his separate property. He takes the position that such separate property is outside of the jurisdiction of the trial court and thus unavailable for a sanction award such as the one imposed here.

Andrew begins his argument by pointing to Family Code section 771, subdivision (a), which reads in pertinent part: "The earnings and accumulations of a spouse . . . while living separate and apart from the other spouse, are the separate property of the spouse." Andrew relies on *In re Marriage of Green* (1989) 213 Cal.App.3d 14 (*Green*); *In re Marriage of Stevenson* (1993) 20 Cal.App.4th 250 (*Stevenson*); and *In re Marriage of Duncan* (2001) 90 Cal.App.4th 617 (*Duncan*). *Green* involved the valuation of a spouse's law practice, and held that "in determining the community property interest in law partnerships . . . in marital dissolution actions, the property date of valuation is the date of separation of the parties." (*Green, supra*, at p. 21.) The *Stevenson* court applied the same rule in valuing a contracting business. (*Stevenson, supra*, at p. 253.) And in *Duncan*, the community property value of an investment advisory business was also determined as of the date of separation. (*Duncan, supra*, pp. 625-626.) The *Duncan* court noted "[c]ase law has established that good cause generally exists for a professional practice to be valued as of the date of separation. [Citations.]" (*Id.* at p. 625.) The *Duncan* court explained that the date of separation was appropriately used for valuation of "'small businesses which rely on the skill and reputation of the spouse who operates them.'" (*Id.* at p. 626.) Andrew argues that *Duncan* is a particularly apt analogy since Mr. Duncan was an investment manager. However, we note that Mr. Duncan managed the assets of pension plans, not his own assets, so the case is factually distinguishable on that ground.

Where the valuation of an asset is determined as of the date of separation, any post-separation increase in value must be allocated between the community and the

separate property estate.  (*Imperato, supra*, 45 Cal.App.3d at p. 436.)  One way to allocate such gains is through a reverse *Pereira* formula, where the court would "allocate a fair return of the increase to the community property and the excess would be the husband's separate property."  (*Id.* at p. 439.)  The trial court followed the rule set forth in *Imperato*, awarding Andrea one-half of the community property as set forth in the 2007 order plus a 10 percent return on the amount of community property as of January 1, 2008, until the entry of judgment.

Andrew argues that the trial court erred in failing to apply the rule set forth in *Imperato* to the Sentry Global account.  Instead, Andrew argues, the trial court ruled that all of the substantial post-separation profits generated by Andrew in the Sentry Global account were entirely community property, even though Andrew accumulated these profits in the same way he accumulated all profits in the other accounts.

Andrew argues that, had the trial court allocated the Sentry Global gains per *Imperato*, the community's interest in Sentry Global would have equaled the original balance ($281,000) plus a 10 percent return (roughly $147,500) for an approximate total of $428,500.  The balance of the gains, totaling $8,846,500, would have been Andrew's separate property, over which the trial court had no jurisdiction to award sanctions under Family Code section 1101, subdivision (g).  (*In re Marriage of Simmons* (2013) 215 Cal.App.4th 584, 593 (*Simmons*).)  Andrew argues that the trial court had no power to convert his post-separation earnings into community property which, according to Andrew, is exactly what the trial court did.

### b.  The trial court's determination that the Sentry Global account was entirely community property was supported by the evidence

We reject Andrew's arguments, and find that under the circumstances of this case, the trial court's finding that the Sentry Global account was entirely community property was supported by the evidence.

The trial court consistently referred to the Sentry Global account as community property.  In response to Andrew's argument below that the trial court improperly divided his separate property, the trial court responded:  "The ruling here does not divide or

14

sanction [Andrew's] separate property, it divided the community property. This account started as a totally community property asset. As a result, the court is not sanctioning [Andrew's] separate property." The trial court's determination that the account was community property is reviewed for substantial evidence.

In reviewing the evidence regarding the nature of the Sentry Global account, we note that the trial court was operating largely in the dark. Due at least in part to Andrew's concealment of the account, there was very little information about the account available to the trial court.

First, as the court noted, the account was opened in May 2006 with entirely community property funds.

On February 7, 2007, the parties entered into a stipulation re: temporary support and custody, pursuant to which Andrew's 2007 trading income exceeding $1.5 million would be community property. There is no record of how much the Sentry Global account grew during the year 2007, but the trial court had to presume that income generated during that year from the Sentry Global account was community property.[5]

---

[5]     Andrew takes conflicting positions on the Sentry Global gains for 2007. In his opening brief, he states "In fact, Andrew's 2006 trading income formed the basis for the February 2007 Stipulation, including his trading gains in Sentry Global." This statement suggests that Andrew was taking the position that the 2007 stipulation encompassed all of his trading income above $1.5 million, regardless of the account. However, in his reply brief he argues that the only transmutations of separate property that occurred pursuant to the 2007 stipulation were gains related to the E*Trade and Union Securities accounts. We reject Andrew's effort to limit the scope of the 2007 stipulation to include only excess income for 2007 realized in the E*Trade and Union Securities accounts. While the stipulation mentions that Andrew earns income by trading in the E*Trade and Union Securities accounts, it does not contain any language limiting the community property income to those accounts. The stipulation states broadly: "To the extent that income is realized in excess of $1.5 M for 2007, the excess income is comm[unity] prop[erty]." In addition, at the time of the 2007 stipulation, Andrea was completely unaware of the existence of the Sentry Global account. Because Andrew improperly concealed the existence of the Sentry Global account from Andrea and the court, he cannot benefit from the omission of a specific mention of the account from the 2007 order.

15

The trial court had no other reliable records or evidence regarding the value of Sentry Global at any time other than the date the account was closed in 2008. On that date, Andrew was able to withdraw $5,920,000, and $595,289 was left in the account.

Given Andrew's failure to disclose this account on four different occasions, and the complete lack of records documenting the value of the account at any time, the trial court was justified in concluding that the asset was entirely community property. Andrew offers no formula for determining what portion of the account should be considered community property other than a 10 percent gain on the $280,000 seed money. Certainly the trial court was not required to adopt that position, which entirely ignores the 2007 stipulation. The evidence suggests that more than $280,000 was community property, and Andrew has provided no reliable evidence as to the account's value during 2007 and up until the account was closed in 2008. It seems the trial court did what it could with the evidence offered. At best, this was a community property interest with a portion that could be considered Andrew's separate property. There was simply insufficient evidence for the trial court to determine what, if any, portion of the account was separate property.

The law grants the trial court some leeway in determining a just and fair outcome where, as here, assets that start as community property gain value after the date of separation. In making an apportionment between separate and community property, "'our courts have developed no precise criterion or fixed standard, but have endeavored to adopt that yardstick which is most appropriate and equitable in a particular situation.'" (*Beam v. Bank of America* (1971) 6 Cal.3d 12, 18.) Nor is the trial court required to apply the exact same formula to each and every asset that gains value after separation. Here, the court determined that the Sentry Global account was entirely community property. It seems that given Andrew's concealment of the asset, and a total lack of

16

records for this asset, the trial court had little choice but to treat the asset as entirely community property.**6**

### 2. The sanction order

Andrew first argues that the trial court exceeded its authority in issuing a sanction order awarding Andrea half of the Sentry Global account.

Andrew relies on *Simmons*, which was published after trial but before the trial court rendered its judgment. In *Simmons*, the trial court awarded wife $245,850.24, the full value of husband's undisclosed separate property savings account. (*Simmons, supra*, 215 Cal.App.4th at p. 588.) Husband argued that the court had no authority to apply the Family Code section 1101, subdivision (h) remedy to the nondisclosure of separate property. (*Ibid.*) After an analysis of Family Code section 1101, the Court of Appeal agreed with this argument. The *Simmons* court noted that Family Code section 1101, subdivision (h) uses the term "any asset," without specifying whether the remedy set forth therein is confined to nondisclosure of a community asset or whether it also applies to nondisclosure of a separate property asset. (*Id.* at pp. 592-593.) Family Code section 1101, subdivision (g), on which the court relied in this matter, uses the same terminology.

After analyzing the statutory scheme, the *Simmons* court determined that Family Code section 1101, subdivision (h) provides a remedy only when a spouse fails to disclose community property. (*Simmons, supra*, 215 Cal.App.4th at p. 593.) This analysis applies equally to a penalty under Family Code section 1101, subdivision (g). However, the Court of Appeal noted that "the spousal fiduciary duty specified in Family Code section 721 is broad enough to encompass the duty to disclose separate property assets during dissolution proceedings." (*Simmons*, at p. 594.) Nevertheless, the court did not construe Family Code section 1101, subdivision (h)'s reference to section 721 as

---

**6**     We note that our holding in this case is limited to the facts of this case. We can envision a scenario where a similar asset is divided into community and separate property based on the time period during which any gains or losses were realized. However, in making such a division of an asset, the court must have evidence of the value of the asset during the time that the gains were community property and during the time that the gains were separate property. Here, the court simply did not have any such evidence.

reflecting an intent to extend the remedy to nondisclosure of separate property.[7] The court noted that there are remedies expressly applicable to separate property, "including [Family Code] section 271 for uncooperative conduct . . . and section 2107 for nondisclosure of marital or separate property in dissolution proceedings." (*Simmons*, at p. 593.) Because the Court of Appeal was not sure "whether the court would have awarded greater sanctions under [Family Code] sections 2107 and 271 had it known the section 1101 remedy was not available," it remanded the matter to the trial court to reconsider sanctions. (*Simmons*, at p. 595.)

Andrew argues that, based on the reasoning of *Simmons*, the trial court exceeded its authority in awarding Andrea half the value of the Sentry Global account on the date of withdrawal under Family Code section 1101, subdivision (g), because all but a small portion of the money was Andrew's separate property.

*Simmons* is distinguishable because it involved an asset which was entirely the husband's separate property. That is not the case here. Here, we have an asset which started as entirely community property. As explained above, there was no evidence from which the trial court could discern what portion of the asset, if any, was Andrew's separate property. The *Simmons* court did not address this situation.

Andrew further argues that no claim for breach of fiduciary duty under Family Code section 1101 arises when there has been no impairment to community property. In other words, section 1101 remedies can be triggered only if a spouse violates his duty to preserve the other spouse's community property interest. Here, Andrew argues, he not only preserved and protected the community property, he in fact caused it to grow.

Andrew's argument begins with Family Code section 1101, subdivision (a), which states:

---

[7]     Family Code section 1101, subdivision (h) reads: "Remedies for the breach of the fiduciary duty by one spouse, as set forth in Sections 721 and 1100, when the breach falls within the ambit of Section 3294 of the Civil Code shall include, but not be limited to, an award to the other spouse of 100 percent, or an amount equal to 100 percent, of any asset undisclosed or transferred in breach of the fiduciary duty."

"A spouse has a claim against the other spouse for any breach of fiduciary duty that results in impairment to the claimant spouse's present undivided one-half interest in the community estate, including, but not limited to, a single transaction or a pattern or series of transactions, which transaction or transactions have caused or will cause a detrimental impact to the claimant spouse's undivided one-half interest in the community estate."

Andrew argues that Family Code section 1101 must be construed as a whole, and subdivision (a) creates the right of action for which a remedy is provided in subdivision (g). We reject Andrew's interpretation of section 1101, subdivision (g), based on its plain language.

Family Code section 1101, subdivision (g) reads:

"Remedies for breach of the fiduciary duty by one spouse, including those set out in sections 721 and 1100, shall include, but not be limited to, an award to the other spouse of 50 percent, or an amount equal to 50 percent, of any asset undisclosed or transferred in breach of the fiduciary duty plus attorney's fees and court costs. The value of the asset shall be determined to be its highest value at the date of the breach of the fiduciary duty, the date of the sale or disposition of the asset, or the date of the award by the court."

On its face, Family Code section 1101, subdivision (g) provides a remedy for the breach of fiduciary duty by a spouse, "including those set out in Sections 721 and 1100." Neither section 721, nor section 1100, requires impairment of the asset in question.

Family Code section 721 provides, in pertinent part, that spouses are subject to the general rules governing fiduciary relationships. "This confidential relationship is a fiduciary relationship subject to the same rights and duties of nonmarital business partners, . . . including, but not limited to, the following: [¶] . . . [¶] (2) Rendering upon request, true and full information of all things affecting any transaction that concerns the community property." (Fam. Code, § 721, subd. (b).)

Family Code section 1100 provides, in pertinent part: "Each spouse shall act with respect to the other spouse in the management and control of the community assets and liabilities in accordance with the general rules governing fiduciary relationships which

19

control the actions of persons having relationships of personal confidence as specified in Section 721, until such time as the assets and liabilities have been divided by the parties or by a court. This duty includes the obligation to make full disclosure to the other spouse of all material facts and information regarding the existence, characterization, and valuation of all assets in which the community has or may have an interest . . . ." (Fam. Code, § 1100, subd. (e).)

The plain language of Family Code section 1101, subdivision (g) expressly encompasses these two statutes, which emphasize the fiduciary duty to disclose information concerning community property. Neither requires impairment of such property. We therefore reject Andrew's argument that the trial court acted impermissibly in imposing a sanction on him under section 1101, subdivision (g).

As a remedy for Andrew's breach of fiduciary duty to Andrea by failing to disclose the existence of the Sentry Global account, a community property asset, the trial court awarded Andrea 50 percent of the value of that asset on the date the account was closed. This sanction was permissible under Family Code section 1101, subdivision (g). Andrew has failed to show that any error occurred.

### B. *Ten percent interest on community property*

Andrew challenges the trial court's decision to award Andrea what he calls "pre-judgment interest" on the community liquid assets. The trial court's discussion of this issue is contained in the tentative decision filed on May 1, 2012. The court explained:

> "It is apparent that since the date of separation, with or without [Andrea's] concurrence, [Andrew] has continued to maintain, trade and grow the primary community asset, cash. He intentionally maintained as large an amount of money as he could by not paying the taxes due and by withholding money from [Andrea], except for support. In fact, he testified that he considered the money 'his' money, not the community's money.

> "He did not pay [Andrea] any of the assets until much later in the dissolution process as that would leave him with more money to invest. As he noted: '[I]t takes money to make money.'"

20

The court noted that under the circumstances, the question was how to treat the community property after the date of separation. The trial court cited *Imperato* for the proposition that "[i]f the earnings of a spouse in some manner increase the value of a community asset [postseparation], the court must then determine what portion of the asset is community property and what portion is separate property." (*Imperato, supra*, 45 Cal.App.3d at p. 436.) The court concluded that an investment portfolio is a community asset within the meaning of *Imperato*. The trial court then discussed the two available methods under *Pereira* and *Van Camp*, concluding that a *Pereira* analysis was more appropriate here. The court stated:

> "Thus, the court applies *Pereira*; under this analysis, it falls to the court to determine a reasonable rate of return for the community. [Andrea] did not provide evidence of a reasonable rate of return. [Andrew] indicated that a reasonable rate of return was 10%, the current legal rate. Under their analysis, [Andrea] would receive $1,971,533 which represents her share of the 2007 profit as well as a 10% return from January 1, 2008 to June 30, 2011.[fn]"

> "[fn] Obviously, in order to enter a judgment in this matter, this figure is to be brought up to date. [Andrea] is entitled to her return of community [*sic*] up to the date of entry of judgment."

The court awarded Andrea "one-half of the community property as set forth in the 2007 stipulation, plus a 10% return on the amount of the community property as of January 1, 2008 until the entry of judgment in this matter."

### 1. Andrew's arguments

Andrew argues that Family Code section 2550 indicates that the community estate shall be divided at the time of the judgment of dissolution of marriage, or at a later time if the court expressly reserves jurisdiction to make such a property division. The only exception to the timing of the division of the estate is found in Family Code section 2108, which authorizes pre-judgment liquidation of a community asset "so as to avoid unreasonable market or investment risks." Thus, Andrew argues, the trial court erred by

21

"implying" that Andrew was required to make pre-judgment distributions of community property to Andrea.

Andrew further argues that pursuant to Code of Civil Procedure section 685.020, subdivision (a), interest does not begin to accrue until judgment is entered. No statute permits pre-judgment interest to be charged on sums due as part of the division of a community estate. The only Family Code provision which mentions pre-judgment interest precludes it. (See Fam. Code, § 2640.)

Thus, Andrew argues, the trial court lacked the authority to award pre-judgment interest to Andrea. Andrew states that because community property values fluctuate during litigation, the parties share the increases and decreases in value occurring before the assets are divided. Andrew cites *In re Marriage of Denney* (1981) 115 Cal.App.3d 543, 549-550 (*Denney*), for the proposition that the trial court is not required to examine, track, and adjudicate values based on these fluctuations in value.[8]

Because Andrea was not entitled to receive any portion of the community estate prior to judgment, Andrew argues, it was error for the trial court to award her any pre-judgment interest on the excess 2007 community property earnings.

### 2. The 10 percent interest was a fair return authorized under the *Pereira* method <u>of determining the value of the community property</u>

Andrew characterizes the 10 percent interest as pre-judgment interest on community property with a set value. Andrew's characterization of this 10 percent interest is inaccurate. The 10 percent interest was applied to determine the value of Andrea's community property interest in the money Andrew continued to invest, pursuant to the formula set forth in *Pereira*.

---

[8] In contrast to this case, *Denney* involved the valuation of a business. The court was addressing the wife's claim that there was a transmutation of her husband's business during the marriage. Wife argued that the increase in the value of the business created a community asset. The trial court had concluded that there was no authority for a finding of transmutation where the value of a business fluctuates during a marriage. Thus, the court did not allow evidence concerning the fluctuating value of that business. (*Denney, supra*, 115 Cal.App.3d at pp. 548-549.) The case does not address the situation where, as here, the value of a community asset is increased by the efforts of one spouse.

22

The court noted that Andrew purposely held as much money as he could so that he could engage in trading and make more money. He did this in spite of Andrea's "numerous requests" that Andrew pay Andrea her share of the assets. While Andrew may not have been required to distribute the money until judgment, he was doing more than simply holding it. He actively used Andrea's portion of the community property in order to make more money. The court explained:

> "It is clear that [Andrea] requested that [Andrew] return her money. It is equally clear that he did not do so deciding instead to keep it to increase his returns. Further, there was absolutely no hesitation in [Andrew] from using the community property as he saw fit in purchasing new homes and supporting his lifestyle. In essence, he determined to prevent [Andrea] from the use and enjoyment of her community property to benefit him through greater returns."

Andrew increased the value of the community's primary asset, cash. Under these circumstances, as the court explained, the court was required to determine what portion of the asset was community property and what portion was Andrew's separate property. (*Imperato, supra*, 45 Cal.App.3d at p. 436.) There are two formulas for doing so, set forth in *Van Camp* and *Pereira*, and discussed in detail above. The trial court chose the *Pereira* formula, and held that 10 percent was a fair return due to the community.

The trial court's reasoning was sound in determining that the *Pereira* formula was better suited to the situation presented in this case. *Pereira* provides authority for the court to impose a 10 percent return on community property that has increased in value due to the efforts of one spouse. The 10 percent return is not, as Andrew characterizes it, interest on a community asset with a set value. Instead, the 10 percent return is part of the formula for determining Andrea's community property interest in that asset, given Andrew's decision to use that asset following separation.[9]

Andrew argues that the portion of the property judgment requiring Andrew to pay prejudgment interest on the excess 2007 community property earnings should be

---

[9] As Andrea points out, Andrew argued for application of a reverse *Pereira* formula to Andrew's use of community funds.

reversed. The record shows that the court calculated a sum of $1,971,533 which represented Andrea's share of the 2007 community profit. The court then ordered that Andrea receive a 10 percent return on her share of the community property from January 1, 2008, to June 30, 2011.

Andrew offers no evidence that the excess 2007 community property earnings should have been treated differently from the other community property. Andrew does not argue that he did not reinvest and utilize the 2007 community property income to generate more money. Under the circumstances, the trial court did not err in concluding that the 2007 community property should be treated like all other community property that Andrew continued to use to generate financial gains following separation.

### C. *Interest on distributed funds*

Andrew's next argument concerns payments that he made to Andrea during the course of the litigation. According to Andrew, the payments he is concerned with are: (1) a $200,000 tax refund due to Andrew that Andrea received on December 1, 2008; (2) $400,000 paid from Andrew to Andrea on May 7, 2010; (3) $793,743 paid from Andrew to Andrea on May 19, 2011; and (4) $78,052 paid from Andrew to Andrea on July 1, 2011. Andrew shows, through a chart, that because these credits were not timely applied to the community income balance, he was required to pay the 10 percent return on these sums and as a result, make a payment to Andrea that was $250,868 too high.[10]

Andrew argues that pursuant to Code of Civil Procedure section 685.030, subdivision (c), interest should have stopped accruing on these sums on the dates Andrea actually received the sums paid to her. In its August 13, 2012 minute order, the trial court stated that Andrew would be given credit, and interest would cease to accrue, on the

---

[10] Andrew notes that the chart reflects an approximation based on pre-judgment spreadsheets and that "many more" prejudgment balance-reducing payments were made. Any arguments concerning payments not specifically referenced with citation to the record are forfeited. (*Nwosu v. Uba* (2004) 122 Cal.App.4th 1229, 1246 ["'[i]f a party fails to support an argument with the necessary citations to the record, . . . the argument [will be] deemed to have been waived'"].)

payments he made to Andrea during the course of the litigation.[11]  Andrew claims that while the property judgment credits Andrew with making these payments, it does not credit him as of the dates that he paid them; instead, it provides that interest continues to accrue on these balance-reducing payments even after he paid them.

Andrew cites no law supporting his position that those payments were required to be credited to reduce the value of the community property.  The trial court had wide discretion to use any reasonable method to fairly apportion the value of the community property.  (*In re Marriage of Ruiz* (2011) 194 Cal.App.4th 348, 358.)

In its final judgment filed on March 19, 2013, the trial court stated:

> "2.  Since the date of separation, [Andrew] has made several payments of community property to [Andrea]:  May, 2010 $400,000; May, 2011 $793,743; June 2011 $78,052 ($1,271,795).  These payments will reduce the amount due under the Sentry Global account, only.  These amounts cannot be used to reduce the amount of any other community asset.

> "[¶] . . . [¶]

> "4.  The amounts of any other reimbursements paid to [Andrea] since the date of separation do not reduce the principle upon which the interest is due nor do they reduce in any way the interest calculation.

> "5.  [Andrea] received the tax check of $200,000.  This will be treated as a return of community property.  This amount will not bear interest payable to [Andrew].  As set forth below, it is used to reduce the amount due under the Sentry Global account."

Andrew does not provide a citation to the record indicating that he objected to the trial court's decision to apply those payments to reduce the sanction award on Sentry

---

[11]     Andrew also notes in his brief that the trial court stated in its November 30, 2012 order "[i]n determining an equalization payment, [Andrew] is to be given credit for [one-half] of the taxes he paid on behalf of the community as of the date that he made the payment."  However, in making this argument Andrew does not refer to any specific taxes that he paid on behalf of the community.  Nor does he cite to any place in the record containing evidence of taxes paid on behalf of the community.  Therefore any argument as to taxes paid on behalf of the community is forfeited.

25

Global. It appears that Andrew did not object to the judgment on the ground that it was error to apply the payments to reduce the Sentry Global sanction. Under the circumstances, the argument is forfeited. (*People v. Riccardi* (2012) 54 Cal.4th 758, 810 [party may not raise on appeal an argument not presented in the trial court].)

On appeal, Andrew argues that if the Sentry Global award is considered a sanction, it could not have been fixed until the judgment was entered, and Andrew cannot reasonably be found to have prepaid it since he did not know it was going to be imposed. We reject this argument. The trial court did not make a factual finding that Andrew intended to prepay a sanction; instead, the trial court implicitly found that this was an equitable way to allocate the payments. Andrew further argues that the findings and statement of decision treated Andrew's prejudgment payments as distribution of community property. Andrew provides no further argument that this prevents the trial court from applying those payments to offset the Sentry Global sanction.

Andrew has failed to convince this court that the trial court committed any error in permitting the 10 percent interest to accrue on the community property balance from January 1, 2008, and applying the payments that Andrew made throughout the proceedings to offset the Sentry Global award.

### D. Wendover Drive properties

During the marriage, two residences were acquired on Wendover Drive in Beverly Hills. A family residence, at 9653 Wendover Drive (9653 property), and an investment property at 9790 Wendover Drive (9790 property) were both purchased. Title to both properties was taken in Andrea's name, with both mortgages on each property also in Andrea's name.

The trial court held that both properties were Andrea's separate property based on valid transmutations. As to the 9790 property, Andrew signed an interspousal deed with the following language: "'It is the express intent of the Grantor, being the spouse of the Grantee, to convey all right title and interest of the Grantor, community or otherwise, in and to the herein described property to the Grantee as his/her sole and separate property.'" As to the 9653 property, Andrew signed a quitclaim deed placing the title of

26

the property in the name of Andrea.  The deed contained the following language:  "'this conveyance establishes sole and separate property of a spouse, R&T 11911'" and "'It is the express intent of the Grantor, being the spouse of the Grantee to convey all right, title and interest of the Grantor, community or otherwise, in and to the herein described property to the Grantee as her sole and separate property.'"

Andrew notes that during escrow for the purchase of the 9653 property, two deeds were signed:  the one by Andrew, described above, dated September 9, 2004, and signed on September 29, 2004, and the deed from the seller, also dated September 9, 2004, but signed by the seller on September 13, 2004.  At the close of escrow, each deed was recorded.  The deed signed by Andrew bore recorder's stamp No. 042532771, and the deed from the seller bore recorder's stamp No. 042532772, indicating it was recorded after the deed from Andrew.

During escrow for the purchase of the 9790 property, two deeds were also signed:  one by Andrew dated July 6, 2005, signed by Andrew on July 7, 2005; and one by the seller dated July 21, 2005, signed on August 4, 2005.  At the close of escrow, each deed was recorded.  The deed signed by Andrew bore recorder's stamp No. 051958899, and the deed from the seller bore recorder's stamp No. 051958900, indicating it was recorded after the deed from Andrew.

Andrew raises two issues on appeal:  first, he argues that no valid transmutation of property occurred as he had no property interest to transmute at the time he executed the deeds.  Second, he argues that Andrea failed to overcome the presumption of undue influence that arises when a transaction between spouses results in significant advantage to one spouse.  As set forth below, we find the trial court did not err in awarding the properties to Andrea as her sole and separate property.

### 1.  A valid transmutation occurred

The Supreme Court recently revisited the law of transmutation in *In re Marriage of Valli* (2014) 58 Cal.4th 1396, 1400 (*Valli*):

> "Married persons may, through a transfer or an agreement, transmute
> -- that is, change -- the character of property from community to separate or

27

from separate to community. (Fam. Code, § 850). A transmutation of property, however, 'is not valid unless made in writing by an express declaration that is made, joined in, consented to, or accepted by the spouse whose interest in the property is adversely affected.' (*Id.*, § 852, subd. (a).) To satisfy the requirement of an 'express declaration,' a writing signed by the adversely affected spouse must expressly state that the character or ownership of the property at issue is being changed. (*Estate of MacDonald* (1990) 51 Cal.3d 262, 272.)"

Here, the deeds signed by Andrew constituted valid transmutations of Andrew's community property interest in each of the Wendover homes. As to the 9653 property, Andrew signed a written quit claim deed conveying the property to Andrea, as her sole and separate property. The deed contained an express declaration of Andrew's intention to convey his community property interest to Andrea and thereby change the character of the property from community property to Andrea's sole and separate property. Thus, the deed meets the requirements of a transmutation set forth in *Valli*.

Similarly, Andrew signed an interspousal deed transferring his community property interest in the 9790 property to Andrea as her sole and separate property. The deed was in writing and contained an express declaration that it was Andrew's intent to transfer the property, community or otherwise, to Andrea as her sole and separate property. The requirements of a transmutation were satisfied.

Andrew argues that the timing of the transmutations renders them ineffective. He argues that a spouse cannot change the character or ownership of property in which he or she does not have an interest; there is nothing to transmute. Andrew argues that neither he nor Andrea had an ownership interest in the Wendover properties at the time Andrew executed the deeds. In addition, each of the deeds was recorded immediately before each of the deeds signed by the sellers. Andrew points out that nothing in the transmutation statutory scheme authorizes the transmutation of property before it is owned by the spouse effecting the transmutation.

First, we note that Andrea argues that Andrew has forfeited this argument because he failed to raise it in the trial court. (*People v. Riccardi, supra*, 54 Cal.4th at p. 810

28

[party may not raise on appeal an argument not presented in the trial court].) We agree. Because Andrew has failed to provide a citation to the record indicating that he raised this argument below, the contention is forfeited.

Although nothing in the statutory scheme specifically authorizes a transmutation of property before the spouse has an interest in the property, Andrew has cited no law suggesting that such a transmutation is necessarily ineffective. While we need not reach this issue, in a situation such as this, where a spouse anticipates ownership of property, we see no reason why the spouse should not be permitted to sign a valid transmutation of such property, transmuting his or her future ownership interest.

In addition, both parties argue that it is not the timing of Andrew's signature on the deeds that is significant, but the timing of the recording of the documents. (See Fam. Code, § 852, subd. (b) [transmutation of real property is not effective as to third parties until recorded].) The deeds at issue were recorded concurrently with the deeds from the sellers and all as part of a single transaction. (See Civ. Code, § 1642 ["Several contracts relating to the same matters, between the same parties, and made as parts of substantially one transaction, are to be taken together"].) We reject Andrew's argument that the numbers on the recorder's stamp should dictate whether a valid transmutation occurred.

### 2. Sufficient evidence existed to rebut the presumption of undue influence

Andrew argues that where a transaction between spouses advantages one spouse, the transaction is presumed to have been induced by undue influence. (*In re Marriage of Delaney* (2003) 111 Cal.App.4th 991, 996.) Andrew points out that, if the property judgment regarding the Wendover properties is allowed to stand, Andrea would be significantly advantaged, therefore the presumption of undue influence applies. Andrew argues that substantial evidence does not support the trial court's determination that Andrea rebutted the presumption of undue influence.

To rebut the presumption, Andrea was required to prove that Andrew freely and voluntarily executed the deeds, with full knowledge of the facts, and with a complete understanding of the effect of the transfer. The trial court found that Andrea met her

burden, stating: "[I]t is clear that [Andrew] knew what he was doing when he signed over the house and he cannot be called unsophisticated."

We review the trial court's decision for substantial evidence. Under this standard, we must affirm the trial court's findings unless, after reviewing the entire record and resolving all conflicts and drawing all reasonable inferences in favor of the judgment, we find there is no substantial evidence to support it. (*In re J.C.* (2014) 233 Cal.App.4th 1, 5.)

Substantial evidence in the record supports the trial court's decision that Andrea rebutted the presumption of undue influence. As the trial court noted, Andrew was a sophisticated businessman. Reviewing the record as a whole, it seems that Andrew was more in control and more knowledgeable about the parties' assets in general. It was Andrew's idea to put the properties in Andrea's name, thus there was no evidence at all that she made any effort to persuade him to take this action.[12] The parties had done this before with previous purchases of property. And there is no need to be a lawyer to understand the language of the documents, which explain clearly that Andrew was giving up his community property rights to the properties and transferring those properties to Andrea as her sole and separate property. Contrary to Andrew's arguments, this evidence is sufficient to rebut a presumption of undue influence. The trial court's finding on the issue of undue influence is supported by the record.

### E. $95,000 reimbursement for improvements to 9790 property

The 9790 property was sold after separation, and the proceeds were awarded to Andrea as her sole and separate property. Andrew paid $95,000 to Newday Construction for improvements to the 9790 property in April 2006, before it was sold. Both parties' forensic experts identified this as a payment made by Andrew for the purpose of improving the 9790 property. Specifically, the money is listed as money spent for "Spec

---

[12]     In fact, Andrew testified that he never told Andrea why he was buying the house in her name. It was never discussed.

house improvements" or "New Day (Investment Property)." As set forth below, this is a payment for which Andrew is entitled to reimbursement.

Family Code section 2640 provides that "[a] party shall be reimbursed for the party's separate property contributions to the acquisition of property of the other spouse's separate property estate," unless there has been a transmutation or a written waiver of such right. (Fam. Code, § 2640, subd. (c).)[13] We review the trial court's implied decision that Andrew had no right to reimbursement for substantial evidence.

Andrea points out that Andrew had the burden of proving a right to reimbursement under Family Code section 2640. Andrew references evidence in the record showing that the $95,000 payment made in April 2006 was for "Spec house improvements." Andrew also references evidence in the record that the parties referred to the 9790 property as a the "Spec house." This evidence was sufficient to establish Andrew's right to reimbursement under Family Code section 2640.

On appeal, any conflicts in the evidence must be resolved in support of the judgment. (*In re Marriage of Cochran* (2001) 87 Cal.App.4th 1050, 1056.) Having established his right to reimbursement, it was up to Andrea to provide this court with citations to the record showing a conflict in evidence which would have allowed the trial court to conclude that reimbursement was not required. However, Andrea has failed to do so. She argues that the testimony of Andrew's expert, Mr. Mowry, was that he was not sure of the purpose of the $95,000 claim. However, Andrea has not provided a citation to the record referencing any such testimony. The record contains over 500 pages of testimony from Mr. Mowry, thus without a citation to the record, we are unable to review or analyze the specific testimony which Andrea claims permitted the trial court to deny reimbursement.

Under the circumstances, we find that no evidence supports the trial court's determination that reimbursement of the $95,000 payment was not required. This portion of the judgment must be reversed.

---

[13] "'Contributions to the acquisition of property'" includes payments for improvements. (Fam. Code, § 2640, subd. (a).)

31

## III. Andrea's cross-appeal

### A. *Child support*

Andrea challenges the trial court's child support award of $37,500 per month.

#### 1. Applicable law and standard of review

Child support is governed by Family Code sections 4000 through 4205. The Statewide Uniform Guideline for calculating the amount of child support, and related rules, are found in Family Code sections 4050 through 4076. Section 4055 provides the mathematical formula to be used for determining child support orders.

Pursuant to Family Code section 4053, subdivision (k), "[t]he guideline is intended to be presumptively correct in all cases, and only under special circumstances should child support orders fall below the child support mandated by the guideline formula." (See also Fam. Code, § 4057, subd. (a).)

Family Code section 4057 provides exceptions to the presumption that the formula set forth under section 4055 is the correct amount of child support. Section 4057, subdivision (b) states that "[t]he presumption of subdivision (a) is a rebuttable presumption affecting the burden of proof and may be rebutted by admissible evidence showing that application of the formula would be unjust or inappropriate in the particular case . . . because one or more of the following factors is found to be applicable by a preponderance of the evidence." One of the factors the court may consider is that "[t]he parent being ordered to pay child support has an extraordinarily high income and the amount determined under the formula would exceed the needs of the children." (Fam. Code, § 4057, subd. (b)(3).)

Child support orders are subject to an abuse of discretion standard of review. (*In re Marriage of Cryer* (2011) 198 Cal.App.4th 1039, 1046.) "As is standard in this type of review, we do not substitute our judgment for that of the trial court, and we will disturb the trial court's decision only if no judge could have reasonably made the challenged decision." (*Ibid.*) Factual findings are reviewed for substantial evidence. (*Ibid.*) "Since we are reviewing a child support order, however, we are mindful that 'determination of a child support obligation is a highly regulated area of the law, and the

32

only discretion a trial court possesses is the discretion provided by statute or rule.' [Citation.]"  (*Ibid.*)

## 2. Deviation from guideline was permissible and within the trial court's discretion

Andrea argues that the statutory guideline formula is presumed to reveal the proper amount of child support.  Here, using Andrew's average income, the guideline support amount was $69,758 per month.  Andrea argues that Andrew had the burden of proving that application of the guideline amount would be unjust or inappropriate.  However, Andrea argues, Andrew provided no evidence that the guideline amount exceeds the children's reasonable needs.  Andrea asserts there was no evidence that the children's reasonable needs were limited to $37,500 per month, and the trial court's order and underlying reasons for ordering support at this level were legally insufficient.

The trial court stated that there was "little evidence, but sufficient evidence nonetheless," to allow the court to determine an appropriate child support award.  The evidence that the trial court reviewed was "the trial transcript as well as [Andrea's] FL-150s."  The court indicated that this evidence was sufficient for the court to determine the children's reasonable needs.

The trial court cited several cases as authority for the proposition that the trial court is permitted to use its common knowledge and common experience in reviewing expenses spent on items such as food, eating out, clothes, entertainment, and travel.  The first, *Ostler*, was decided prior to the enactment of the current Uniform Statewide Child Support Guideline.  However, the *Ostler* court noted that the statutory scheme in effect at the time provided for a mandatory minimum in child support, but allowed for a higher award when a higher award was warranted.  (*Ostler, supra*, 223 Cal.App.3d at pp. 51-52.)  In concluding that there was sufficient evidence for the trial court to determine approximately what the needs were of the two minor children, the *Ostler* court noted that the trial court was permitted to fix a reasonable sum where the matters are nontechnical in nature and of common knowledge.  "The court could call on its own knowledge of such things as inflation, the cost of car insurance for male teenaged drivers, the cost of

major vacation trips, and allowances as the boys aged, as well as the increased cost of their food and clothing." (*Id.* at pp. 53-54.)

The second case, *Strohm v. Strohm* (1960) 182 Cal.App.2d 53, also predates the current child support guidelines, and involved an award of alimony. In affirming the award, the *Strohm* court noted that there was sufficient evidence from which the court could determine what the plaintiff's needs were. It also noted, "[t]he matters on which the amount of the award was predicated are nontechnical in nature. Determining the amount comes within the rule that the trier of fact may fix a reasonable sum where the matters are nontechnical in nature and of common knowledge. [Citations.]" (*Id.* at p. 57.)

Under the authority provided in these cases, the trial court here scrutinized Andrea's FL-150 and the testimony at trial to determine the appropriate amount of support. Specifically, the court noted that it relied on Andrea's March 2012 FL-150, plus Andrew's FL-150s. Upon reviewing both Andrea's testimony and her FL-150s, the court concluded that Andrea's expense numbers were inflated. The court named several expenses that appeared inflated, such as $45,000 per year in clothing, $50,000 per year in restaurants, and an additional $55,000 per year in groceries. The child care figure of $8,000 per month also seemed inflated, especially since Andrea does not work outside the home.

The court looked at the reasonable needs of Andrea and the household and set the child support amount at $37,500 per month, or $450,000 per year. We find no error in this decision. As the trial court noted, it was permitted to deviate from the statutory guideline where, as here, Andrew is an extraordinarily high income earner. Relying on the trial testimony, the FL-150s filed by both parties, and the court's own common knowledge, the court was able to fix a reasonable sum for child support.

### 3. Sufficient evidence existed for the trial court to determine the children's reasonable needs

Andrea argues that the statutory mandates required Andrew to establish what these children of such a wealthy father reasonably needed. However, Andrew chose not to

34

offer any evidence on this subject. Instead, Andrew devoted his energy to attacking Andrea's evidence regarding what she had been spending on the children. As a matter of law, Andrea argues, Andrew did not meet his burden of proof. Andrea cites *California Shoppers, Inc. v. Royal Globe Ins. Co.* (1985) 175 Cal.App.3d 1, 48 (*California Shoppers*) for the proposition that a total rejection of Andrea's evidence did not create affirmative evidence of the children's needs.

In *California Shoppers*, the Court of Appeal scrutinized a $3 million jury award for a breach of contractual duty to defend. One of the factual issues was whether an employee of the insurance company had intentionally denied coverage to California Shoppers, when his testimony was that he believed the complaint at issue had been forwarded from a different organization. Thus, for the jury to have found that this employee had intentionally denied coverage to the plaintiff, his knowledge that the complaint came from the plaintiff would have had to be inferred. (*California Shoppers, supra*, 175 Cal.App.3d at p. 47). Because there was "no direct evidence from which the jury could logically and reasonably infer that [the employee] had identified California Shoppers as the party tendering defense," the court held that the jury could not permissibly have drawn the inference of such knowledge. (*Id.* at p. 48.)

The *California Shoppers* court went on to discuss the suggestion that the jury could have disbelieved the employee's testimony that he did not realize it was California Shoppers, as opposed to a different company, that had tendered defense of the complaint. In that context, the court held that such disbelief did not support an inference that the employee did know that California Shoppers had tendered the defense. The court noted: If a witness testifies, for instance, that *it was not raining* at the time of the collision, and if the jury disbelieves that testimony, such belief does not provide evidence that it *was raining* at the time of the collision." (*California Shoppers, supra*, 175 Cal.App.3d at p. 48.)

Similarly, Andrea argues, the trial court's outright rejection of Andrea's declaration as to the children's needs cannot provide evidence of the actual children's needs.

We find that the situation before us differs from that presented in *California Shoppers*. Here, the trial court did not reject Andrea's evidence out of hand. Instead, it expressly relied on her March 2012 FL-150 in determining a support number. However, the court found that Andrea's expense numbers were "inflated" and that she "may be double counting some of the costs." Thus, it is apparent that the trial court rejected some, but not all, of Andrea's representations regarding the reasonable needs of the children. Further, even if the trial court had entirely rejected Andrea's evidence, the court had other evidence upon which to determine the children's reasonable needs, including Andrew's FL-150s and the trial testimony.

We reject Andrea's contention that Andrew was required to present affirmative evidence of the children's needs. Family Code section 4057, subdivision (b) states that the presumption that the formula provided in section 4055 is the correct amount of child support "is a rebuttable presumption affecting the burden of proof and may be rebutted by admissible evidence showing that application of the formula would be unjust or inappropriate in the particular case." There is no requirement that this evidence be provided by the parent who is urging a deviation from guideline support. Furthermore, as Andrew points out, a party's burden of proof may be satisfied with evidence supplied by the party without the burden. In *Perotti v. Sampson* (1958) 163 Cal.App.2d 280, the court discussed the defendant's burden of proving contributory negligence, and noted "[t]hat burden of proof may be satisfied by the evidence produced by plaintiff alone if the jury finds from plaintiff's own evidence that the probabilities are in favor of such contributory negligence." (*Id.* at p. 283.) The *Perotti* court also quoted a discussion of a jury instruction on the subject which explained: "'It is important to note the distinction between the burden of proof as an obligation or risk imposed by law, and the *means* by which the burden may be fulfilled. When the burden is yours, it is possible for evidence produced by your adversary to be the means.'" (*Ibid.*)

Thus, contrary to Andrea's position, it was permissible for the trial court to find that application of the guideline formula was inappropriate in this case based solely on evidence presented by Andrea.

36

Andrea also takes issue with the trial court's decision to use its own experience in determining the reasonable needs of the children who have a parent with an extraordinarily high income. She argues that the Statewide Uniform Child Support Guideline, the Legislature eliminated much of the discretion trial courts previously had over the amount of child support awarded. Andrea cites *In re Marriage of Carter* (1994) 26 Cal.App.4th 1024, 1028 (*Carter*) for the proposition that "a trial court no longer has the broad discretion in ordering child support which it had prior to the enactment of the new statutory scheme effective July 1, 1992 [citation]."

In *Carter*, it was undisputed that the trial court failed to order child support in accordance with the formula in the guideline. However, in that case, the court "did not find any special circumstances justifying an order below the guideline [citation]." (*Carter, supra*, 26 Cal.App.4th at pp. 1028-1029.) The court did not find "any of the specified factors to rebut the presumption that the amount established by the formula was the correct amount." (*Id.* at p. 1029.)

Here, in contrast, the trial court specifically found that a deviation from the guideline was appropriate and in the children's best interest pursuant to Family Code section 4057, subdivision (b)(3). This statute permits the court to order child support below the guideline amount in cases where the parent being ordered to pay child support is an extraordinarily high income earner. Under this statute, the trial court has the discretion to determine the reasonable needs of the children. In contrast to *Carter*, the trial court here specifically followed the statutory scheme and determined that a deviation from the guideline was appropriate. The court then used the evidence before it, as well as its own experience, to determine a reasonable amount of child support. There is no evidence in the record that the court conjured a number out of thin air, as Andrea asserts. The court's actions were well within the legal limits of its discretion.

### 4. The court's findings were sufficient

Andrea next asserts that the trial court committed reversible error per se by not making the findings required to justify a deviation below the presumed guideline amount of child support. Andrea points out that Family Code section 4056, subdivision (a)(3)

37

requires that when a court is ordering less than guideline support it must state the "'reasons the amount of support ordered is consistent with the best interests of the children.' [Citation.]" (*Rojas v. Mitchell* (1996) 50 Cal.App.4th 1445, 1450 (*Rojas*).)

In *Rojas*, the court reversed a child support order of $5,500 per month because the trial court deviated from the guideline amount but failed to provide the information required under Family Code section 4056, subdivision (a).[14] In doing so, the court did not suggest that the support order was defective or unsupported by substantial evidence. (*Rojas, supra,* 50 Cal.App.4th at p. 1451.) However, the court reversed and remanded under Family Code section 4056, subdivision (a), because the trial court had not made the required findings.

Here, the trial court made the findings required under Family Code section 4056, subdivision (a). Attached to the judgment was form FL-342, the non-guideline child support findings attachment. The document states, "The court makes the following findings required by Family Code sections 4056, 4057, and 4065." The findings include the guideline amount of child support calculated, and specifies that the reason for the deviation from this amount is that the parent paying support has extraordinarily high income, and the amount determined under the guideline would exceed the needs of the children.

Further, in the judgment itself, the trial court devoted over five pages to its discussion of the law and facts that supported its decision to deviate from the guideline amount of child support. In this discussion, the court again explained that a deviation from the guideline is appropriate in this case under Family Code section 4057, subdivision (b)(3). In explaining why the deviation was in the best interests of the

---

**14**     Family Code section 4056, subdivision (a), provides: "To comply with federal law, the court shall state, in writing or on the record, the following information whenever the court is ordering an amount for support that differs from the statewide uniform guideline formula amount under this article. [¶] (1) The amount of support that would have been ordered under the guideline formula. [¶] (2) The reasons the amount of support ordered differs from the guideline formula amount. [¶] (3) The reasons the amount of support ordered is consistent with the best interests of the children."

children, the court noted that the children did not enjoy a significantly more affluent lifestyle at father's home despite his far greater income. For example, the parties live in equivalent homes, in equivalent neighborhoods. In addition, Andrew does not take them places or do things with them that Andrea cannot do with them. Despite Andrew's significantly higher income, it appeared that Andrea spent far more money on the children than Andrew. In other words, Andrew was the more fiscally conservative parent. Under the circumstances, the court felt there was a risk in allowing the lower income earner to drive the lifestyle, which could force the higher income earner into a more expensive lifestyle.

The court created a chart summarizing the pertinent contents of Andrea's December 2011, March 2012 and September 2012 income and expense statements. The court attributed no less than 50 percent, but mostly 100 percent, of each expense category to the children, and arrived at a total of $42,900 per month attributable to the children, before discounting Andrea's overstatement of the expenses to arrive at the $37,500 figure.

In contrast to Andrea's arguments, the trial court's judgment reveals careful consideration of the evidence and clear articulation of its reasons for deviation from the guideline. As set forth above, the court's actions were well within its discretion, and no error occurred.[15]

---

[15] *McGinley v. Herman* (1996) 50 Cal.App.4th 936 (*McGinley*), also cited by Andrea, is distinguishable. In *McGinley*, the father of an 18-month-old child born out of wedlock was found to be an extraordinarily high income earner. In making a support award totaling $2,000 per month, the trial court stated that it would be "'nonsensical' to award McGinley the guideline amount of child support based on a 'causal relationship that result[ed] in the birth of a child.'" (Fn. omitted.) The court indicated that "a support figure of $2,000 'came to mind, because we have a lot of cases like this. And that's usually been the real limits that I've seen.'" (*Id.* at p. 940.) In reversing the order, the court found that these statements fell far short of the requirement that the court provide its reasons that the child support award is consistent with the best interests of the child. In particular, "the trial court's assessment of the best interests of the child did not give sufficient consideration to the child's right to share in the standard of living of his

39

**5. The trial court did not err in setting a start date of January 1, 2013, for the child support order**

Andrea argues that the trial court committed legal error by failing to make the permanent child support order effective as of June 2011.

Under a pretrial temporary child support order, Andrew was paying Andrea $14,590 per month in child support from December 4, 2006 through May 15, 2010, then $19,057 per month from May 15, 2010 through January 1, 2013. The court made the permanent child support award, set after trial at $37,500 per month, effective January 1, 2013.

Andrea had argued before the trial court that the child support award should be considered effective as of the first day of the month after the trial started in May 2011. When the court issued its statement of decision in May 2012, it noted that it would be "inappropriate" to order the new child support award retroactive to the beginning of trial because the trial had taken so long. The trial court reiterated this sentiment in its final amendments to the judgment issued in November 2012. The court stated:

> "This new child support number starts on January 1, 2013 or entry of the judgment whichever is sooner. Given the length of the litigation as well as the acrimony between the parties, starting the new support amount at any other date is simply inappropriate to do the most justice for both parties. This start date allows the parties the stability of the past amount, while not creating a substantial arrearage or overage."

Andrea argues that the court's reasoning was flawed. She states that the law requires the court to focus exclusively on the children's needs, as measured by the parent's ability to pay support. (*In re Marriage of Cheriton* (2001) 92 Cal.App.4th 269, 293-294 (*Cheriton*). Andrea cites Family Code section 4053, subdivisions (a), (c), and (e), which require the court to consider the best interests of the children, mandate that a parent's "first and principal" obligation is to support his or her children according to the parent's station in life, make the interest of the children "the state's top priority," and

extraordinarily high earning father." (*Id.* at p. 945.) In this case, the trial court provided a full discussion of its reasoning, in accordance with Family Code section 4056.

40

require support orders that ensure children receive the support to which they are entitled under the guideline statutes in a timely manner. Andrea argues that the trial court's decision not to make the child support order effective earlier is reversible error because the court focused on the parents' circumstances rather than the needs of the children.

Andrea relies heavily on *Cheriton*, which we find distinguishable. In *Cheriton*, the wife challenged a child support order of $2,292 per month for the husband's four children. As one of several arguments, the wife argued that the trial court erred in refusing to make the order retroactive to March 1997, when she first filed her modification motion. The Court of Appeal agreed that the court's analysis in not making the order fully retroactive to the date of filing the petition for modification was flawed. The court noted, "It . . . appears to us that the court erroneously based its analysis of the retroactivity question on the *parents'* situation in 1997 -- *their* property division, *their* attorneys' fees, *their* tax obligations. So far as we can glean from the record, the court did not independently assess the children's needs in acting on Iris's request for a fully retroactive support modification." (*Cheriton, supra*, 92 Cal.App.4th at p. 300.)

Here, in contrast, there was no motion for modification pending during trial. Instead, Andrew had been paying support in line with temporary child support orders that were in effect through trial. *Cheriton* does not suggest that it is error to start a child support order prospectively after trial. In addition, in contrast to the circumstances in *Cheriton*, here the court made extensive findings regarding the children's current needs. While the court's retroactivity analysis mentions the length of the trial and the acrimony between the parties, the record as a whole suggests that the court also carefully considered the needs of the children.

As noted in *Cheriton*, Family Code section 3653, subdivision (a), provides, in part, that "[a]n order modifying or terminating a support order may be made retroactive to the date of the filing of the notice of motion or order to show cause to modify or terminate, or to any subsequent date." (*Cheriton, supra*, 92 Cal.App.4th at p. 300.) Thus, where a petition to modify a child support order is filed, the court has jurisdiction to enter an

order retroactive to the date of the filing of such motion.  There is no authority suggesting that the trial court may retroactively order child support under any other circumstances.

Andrea has presented no authority suggesting that the trial court erred in setting a posttrial start date for the new child support order.  In fact, "[i]t has long been the rule in California that an order for child support only operates prospectively.  [Citations.]" (*In re Marriage of Goosmann* (1994) 26 Cal.App.4th 838, 844.)  *Goosmann* is instructive.  There, the husband argued that the trial court erred by awarding, in 1992, child support retroactive to 1990.  The Court of Appeal reversed the award insofar as it awarded child support arrearages prior to the filing of the order to show cause regarding child support which was filed by the wife on January 23, 1992.  The *Goosmann* court noted:  "The long-standing rule is that a parent cannot claim reimbursement for money paid out in support of a child prior to an order of the court directing the other parent to pay support to meet the current needs of the child.  [Citation.]" (*Id.* at p. 844.)

Andrea has failed to show legal error in the trial court's selection of a start date for child support.

### B.  Post-separation gains

Andrea next argues that the trial court improperly applied *Pereira*  in characterizing post-separation gains.  Andrea claims that the 2007 stipulation should be held to continue to be binding between the parties in years subsequent to 2007.  Because the 2007 stipulation continued to be binding, Andrea argues, the trial court should have applied a *Van Camp* analysis, with Andrew's yearly reasonable compensation set at $1.5 million and the balance of the earnings belonging to the community.

Section II.B. of this opinion contains an extensive discussion of the trial court's ruling regarding post-separation gains, including our conclusion that the court's reasoning was sound in determining that the *Pereira* formula was better suited than the *Van Camp* formula to address the situation presented in this case.  We do not repeat the discussion here, but bear it in mind in addressing Andrea's arguments.

Andrew argues that Andrea's contract theories of partial performance, termination at will, unjust enrichment, and estoppel have all been waived due to Andrea's failure to

raise them in the trial court. Andrea has failed to provide a citation to the record indicating that she raised these issues in the trial court, therefore we consider them forfeited on appeal. (*In re Marriage of Holtemann* (2008) 166 Cal.App.4th 1166, 1174.) As shown in the brief discussions below, these claims are also without merit.

### 1. The 2007 stipulation applied only to 2007

Andrea first argues that with the 2007 stipulation, the parties contracted for a *Van Camp* application. Andrea argues that because the stipulation did not have an ascertainable term of duration, it was terminable at will and should have been held to apply beyond 2007.

The 2007 stipulation states, in pertinent part:

> "The orders presume that [Andrew] will generate income from said trading of $1.5 [million] annually. Any income in the accounts up to $1.5 [million] annually (1/07-12/07) shall be [Andrew's] income from which he shall pay the support, and [Andrew] shall pay all [federal and] state tax liability thereon and shall indemnify and hold [Andrea] harmless therefrom. To the extent that income is realized in excess of $1.5 [million] for 2007, the excess income is [community property]. Each party shall be responsible for and pay the [federal and] state tax on the income in excess of $1.5 [million]."

This language sets forth a clear time period: calendar year 2007. Nevertheless, Andrea argues that there is no provision in the 2007 stipulation stating that it would only apply to Andrew's 2007 trading gains. Andrea emphasizes that the court used the term "'annually' -- plural -- not 'annual' -- singular." However, the word "annually" is an adverb, not a plural form of the word "annual." In the order set forth above, the adverb "annually" modifies Andrew's act of generating income, indicating a time period of one year. Reading the paragraph as a whole, and in particular the references to calendar year 2007, there is no reason to interpret the term "annually" as including any calendar years other than 2007.

Andrea further argues that the stipulation contains the following language: "The orders agreed to herein shall stay in effect until superseded by judgment or further order of Court, whichever first occurs." In fact, the language in its entirety reads: "The orders

agreed to herein shall stay in effect until superseded by judgment or further order of Court, whichever first occurs, and all other orders made in this case shall remain in full force and effect *except as otherwise provided herein*." (Italics added.) The paragraph at issue specifically provides that it is limited as to time, and pertains only to calendar year 2007.

Andrea cites *Consolidated Theatres, Inc. v. Theatrical Stage Employees Union* (1968) 69 Cal.2d 713, 727, and *Zee Medical Distributor Association, Inc. v. Zee Medical, Inc*. (2000) 80 Cal.App.4th 1, both of which discuss contracts lacking ascertainable terms of duration. We find the cases irrelevant, because in this case the 2007 stipulation contains an express term of duration: calendar year 2007.

Andrea argues that where a party to a contract continues performance after expiration of the contract, with the consent, either express or implied, of the other contracting party, the court will view the contract as extended when evaluating compensation due. (Citing *Hermann v. Littlefield* (1895) 109 Cal. 430.) Andrea also contends that a time limitation in an agreement may be waived where the parties continue to perform after the contract expired, with the knowledge and approval of both parties. (Citing *Baker v. Curtis* (1951) 105 Cal.App.2d 663, 669-671.) Andrea states that Andrew continued to exercise control over the community funds through trial, that Andrea asked for the funds, and that Andrew did not provide them. At the same time, Andrew continued to reap the benefits of the agreement by way of reduced child support and spousal support. Andrea argues that Andrew cannot now deny that the 2007 stipulation was ongoing.

Under Family Code section 1100, subdivision (a), Andrew had the authority to exercise management and control of the trading accounts. Under section 1100, subdivision (e), he was required to act in accordance with the general rules governing fiduciary relationships. Andrew's continued use of the community funds was not a negotiated portion of the 2007 stipulation. Instead, the order provided an explanation of the source of income for Andrew's spousal and child support payments, and a means by which such income would be distributed for the year 2007. Andrea's contention that

44

Andrew's continued use of the funds constituted a continuation of performance of the 2007 stipulation is unfounded. To the extent that the trial court made an implied finding that Andrew's continued use of the community funds for trading purposes did not constitute an extension of the 2007 stipulation, that finding is amply supported in the record.

## 2. The court did not make a finding of unjust enrichment

Andrea further argues that the trial court's application of *Pereira* was in violation of the prohibitions against unjust enrichment. Andrea provides an extensive overview of the doctrine of unjust enrichment, then argues that Andrew was not entitled use the community funds for his own gain and then deny the existence of an agreement which provided for Andrea to share in those gains.

Unjust enrichment is a factual question for the trier of fact to resolve. (See, e.g., *Ajaxo Inc. v. E*Trade Financial Corp.* (2010) 187 Cal.App.4th 1295, 1301-1303.) Here, there is no evidence of a factual finding of unjust enrichment by the trial court. As set forth above, the trial court's application of *Pereira* was reasonable and in accordance with the law.

## 3. The court did not make a finding of estoppel

Andrea argues that Andrew's claim that the post-separation growth was to be treated as his alone is a violation of his duty of good faith and fair dealing. Andrea claims that given this duty of good faith and fair dealing, Andrew is estopped from denying that the post-separation gains are community property. Andrew's duty required that he acknowledge the existence of an agreement through which he had access to the funds in the first place.

The existence of estoppel is a question of fact for the trier of fact. (*Ortega v. Pajaro Valley Unified School Dist.* (1998) 64 Cal.App.4th 1023, 1043. """[O]rdinarily the [fact-finder's] determination is binding on appeal unless the contrary conclusion is the only one to be reasonably drawn from the facts."' [Citation.]" (*Ibid.*) Any implied finding by the trial court that the doctrine of estoppel does not prevent application of the *Pereira* formula to divide post-separation gains is supported by the record. The trial

court reasonably interpreted the 2007 stipulation to apply only to the year 2007. Any further communications by Andrew suggesting that he was making money for himself and Andrea did not reference the 2007 stipulation or imply that the 2007 agreement remained in effect. We therefore reject Andrea's estoppel theory.

### C. Sanctions

Andrea argues that the trial court committed reversible error by failing to order necessary and appropriate fees and sanctions against Andrew under Family Code sections 271, 2107, and 1101.[16] We conclude that no error occurred.

Andrea sought sanctions pursuant to Family Code sections 271 and 1101. She requested fees pursuant to sections 2030, 1101, and 2107. She sought a total of $721,657 in professional fees and $22,000,000 in sanctions. She also requested $60,545 in legal fees paid in relation to Andrew's earlier unsuccessful appeal. Of these requests, the trial court granted her $500,000 in legal fees. Andrea argues that this was insufficient given Andrew's conduct in the case and the economic disparity between the parties.

Andrea enumerates several wrongdoings on the part of Andrew: failure to provide discovery; intentionally withholding money so that he could reap the benefits in trading; and the withdrawal of $2.7 million from Sentry Global for his personal use in purchasing real estate, without informing Andrea. In addition, Andrea argues, Andrew was found in contempt for violating court orders.

The trial court found that there is no support in the law for the damage award that Andrea sought against Andrew, therefore denied the roughly $22 million request. The trial court referenced a case, *In re Marriage of Economou* (1990) 224 Cal.App.3d 1466, apparently cited by Andrea, concluding that it was not dispositive.

---

[16]    Andrea also argues that Andrew should have been sanctioned for his failure to disclose the Sentry Global investment as required under Family Code section 2100. However, she states that "To the extent this court affirms the award of 50% of Sentry Global on other grounds" this argument need not be addressed. Because we have affirmed the trial court's award to Andrea of 50 percent of Sentry Global, we decline to address this argument.

46

Nevertheless, the trial court awarded Andrea $500,000 in fees. This was in addition to $745,000 previously paid by Andrew for Andrea's attorney fees. The court awarded these additional fees "[i]n light of the economic disparity between the parties and the fact that [Andrew] failed to disclose certain accounts." Thus, the additional fee award met the criteria for an award under Family Code section 271.[17] It appears that the trial court failed to cite the statute but did provide certain fees in accordance with Andrea's request. Under the circumstances, Andrea cannot complain that no fee sanction was ordered.

Andrea further argues that the trial court erred in granting only 50 percent of Sentry Global as a sanction under Family Code section 1101. She contends that it is wholly insufficient to grant a spouse what she is already entitled to as a sanction. Andrea asks that we reverse and remand to have the court issue a new sanction order against Andrew without using Andrea's community property.

Family Code section 1101, subdivision (g) states:

> "Remedies for breach of the fiduciary duty by one spouse, including those set out in Sections 721 and 1100, shall include, but not be limited to, an award to the other spouse of 50 percent, or an amount equal to 50 percent, of any asset undisclosed or transferred in breach of the fiduciary duty plus attorney's fees and court costs. The value of the asset shall be determined to be its highest value at the date of the breach of the fiduciary duty, the date of the sale or disposition of the asset, or the date of the award by the court."

---

**17**    Family Code section 271 provides, in part: "(a) Notwithstanding any other provision of this code, the court may base an award of attorney's fees and costs on the extent to which the conduct of each party or attorney furthers or frustrates the policy of the law to promote settlement of litigation and, where possible, to reduce the cost of litigation by encouraging cooperation between the parties and attorneys. An award of attorney's fees and costs pursuant to this section is in the nature of a sanction. In making an award pursuant to this section, the court shall take into consideration all evidence concerning the parties' incomes, assets, and liabilities. The court shall not impose a sanction pursuant to this section that imposes an unreasonable financial burden on the party against whom the sanction is imposed. In order to obtain an award under this section, the party requesting an award of attorney's fees and costs is not required to demonstrate any financial need for the award."

47

In accordance with this statute, the trial court awarded Andrea one-half of the balance in the Sentry Global account on the date that the account was closed. This award was in accordance with the law and did not constitute an abuse of the court's discretion.

## DISPOSITION

The judgment is reversed insofar as it denies Andrew reimbursement for the $95,000 that he paid for improvements to the 9790 property in April 2006. In all other respects, the judgment is affirmed. Each party shall bear their own costs of appeal.

<u>NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS</u>.


_____, J.
                CHAVEZ

We concur:


_____, P. J.
BOREN


_____, J.
ASHMANN-GERST